# IN THE UNITED STATES DISTRICT COURT

# FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| DALE GUILFOIL, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | C. A. No. 06-493-GMS |
| | ) | |
| DAVID PIERCE, et al, | ) | JURY TRIAL REQUESTED |
| | ) | |
| Defendants. | ) | |

## STATE DEFENDANTS' MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF THEIR MOTION FOR SUMMARY JUDGMENT

### STATEMENT OF FACTS

1.     On August 8, 2006, Plaintiff Dale Guilfoil ("Plaintiff") filed a prisoner civil rights action, claiming that Defendants David Pierce, James Scarborough and Karl Hazzard of the Delaware Correctional Center ("DCC") exhibited "deliberate indifference" to his back injury circumstances while Plaintiff was incarcerated there. *[D.I.2]*

2.  Plaintiff maintains that he should have received the bottom bunk in his cell at DCC's Building W because he suffered from back pain that prevented him from climbing to the top bunk to which he was assigned.  *Id.*

3.     In his Complaint, Plaintiff states that on or about February 14, 2006, he was first assigned to the top bunk in his cell.  *Id.*  Plaintiff began sleeping on the floor with his bunk mattress at this time.  *Id.*

4.     On February 15, 2007, Plaintiff claims he filed a grievance form and medical grievance because he was assigned to a top bunk.  *Id.*  According to Plaintiff, he received a written response from DCC staff on March 8, 2006.  *Id, Statement of Claim, ¶ 2.*

5.      In Exhibit B1 of the Complaint (Plaintiff's Grievance and Reply), which Plaintiff admits was received on *March 8, 2006*, Plaintiff was told to "submit a sick call slip if medical feels you need a bottom bunk, they will send a [medical] memo to the Security Chief for approval." *Id, Exhibit B1, page 2.*

6.      Nevertheless, Plaintiff continued to submit his medical Memo dated *February 22, 2006* to request a bottom bunk. *Id, Exhibit C.* This February 22, 2006 memo is illegible; in the critical part of the Memo, the message section, only the word, "Bottom" can be clearly read. *Id.* The remainder of the memo's message cannot be deciphered.

7.      Plaintiff did not submit another Memo to DCC staff as he was directed to on March 8, 2006. Rather, he filed a grievance form dated April 24, 2006. *Id, Exhibit D.* After submitting this grievance form, Plaintiff was advised that this request was "not processed through the grievance procedure. Please correspond with the appropriate office to secure the information that is requested." *Id.* Plaintiff was advised that approval could be issued through "Holman or Scarborough." *Id.* The DCC response written on this grievance form was dated May 15, 2006.

8.      Plaintiff has not supplied any documentary evidence that he wrote to either Holman or Scarborough for his bottom bunk assignment. *See Plaintiff's Response to Discovery Request for Production of Documents, [D.I.46]*

9.      On May 20, 2006, Plaintiff wrote to Defendant Pierce, the Deputy Warden, regarding his bunk situation. *D.I.2, Exhibit E-1.* Defendant Pierce replied on June 5, 2006, advising Plaintiff that he was forwarding Plaintiff's concerns to the Director of Nursing. *Id, Exhibit E-2.*

2

10.    On July 7, 2006, a staff member of Correctional Medical Services ("CMS") replied in writing to Plaintiff's letter dated May 20, 2006. *Id., Exhibit F.* This CMS letter informed Plaintiff that the corrections staff determined housing and living arrangements. *Id.*

11.    Plaintiff has not produced any evidence of correspondence to Scarborough or Holman regarding his living arrangements, nor did he submit a medical memo other than the illegible one dated February 20, 2006. *See Plaintiff's Response to Discovery Request for Production of Documents, [D.I.46]*

12.    On or about August 2006, Plaintiff was no longer housed in the Building W.

13.    Plaintiff relates that there was little difference in sleeping on the floor of his cell with his mattress versus sleeping on the metal bunk with the same removable mattress.[1] *See Exhibit A, Deposition of Dale Guilfoil, pages 26, 50.*

14.    Plaintiff has not alleged any specific, wrongful actions by Defendant Pierce in his Complaint. *[D.I.2]* Plaintiff admits that he never met nor spoke to Defendant Pierce. *See Exhibit A, Deposition of Dale Guilfoil, page 48.*

15.    Plaintiff has not alleged any specific, wrongful actions by James Scarborough or Karl Hazzard in his Complaint. [D.I.2] The basis for Plaintiff's allegations against both individuals stem from hearsay statements apparently related to him from the nursing staff and another corrections officer. *See Exhibit A, Deposition of Dale Guilfoil, pages 48-50.*

16.    Although Plaintiff relates his disappointment from the perceived delay in action, he did not follow the instructions presented to him in his grievance responses. *[D.I.2].*

---

[1] While Plaintiff says there was relatively little difference between sleeping on the floor or sleeping on the mental bunk, Plaintiff does make some distinctions. Plaintiff explains in his deposition (on page 50) that it was more difficult to get up from the floor from his mattress than it would have been if he had been assigned to the bottom bunk in his cell. Plaintiff also notes that he experienced discomfort after sleeping on the floor with his mattress, but those symptoms began to fade after he left Building W. *Id.*

## MEMORANDUM OF LAW

The Court shall grant a motion for summary judgment if "there is no genuine issue as to any material fact and the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c). An issue is genuine if the jury could return a verdict for the nonmoving party. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). The burden of proof is on the moving party to demonstrate the absence of material issues of fact, and inferences drawn from the facts must be viewed in the light most favorable to the nonmoving party. However, once the moving party advances evidence in support of its contentions, the nonmoving party must go beyond the pleadings and introduce affidavits and other evidence that will create a genuine issue of fact in order to avoid summary judgment. *Celotex Corp. v. Catrett*, 477 U.S. 317, 324 (1986).

In this case, because there is no genuine issue of material fact, State Defendants are entitled to judgment as a matter of law.

## I.    A CLAIM OF DELIBERATE INDIFFERENCE CANNOT BE ALLEGED AGAINST THE DEFENDANTS

The claim of "deliberate indifference," as propounded in Plaintiff's Complaint, stems from the Eighth Amendment right to adequate medical care. *Estelle v. Gamble*, 429 U.S. 97, 106 (1976). To state a violation of this right, a prisoner "must allege acts or omissions sufficiently harmful to evidence deliberate indifference to <u>serious</u> medical needs." *Id. (emphasis added).* A defendant is deliberately indifferent only where he or she has the required mental state. *Williams v. First Correctional Medical*, 377 F. Supp. 2d 473, 476 (D. Del. 2005). That is, a defendant can be held liable only where "the official knows of and disregards an <u>excessive</u> risk to inmate health or safety; the official must both be aware of facts from which the inference could be drawn that a

substantial risk of serious harm exists, and he must also draw the inference." *Farmer v. Brennan*, 511 U.S. 825, 837 (1994). *(emphasis added).*

Plaintiff cannot demonstrate that he has a "serious medical need." He stated in his deposition that after leaving Building W, his perceived symptoms from sleeping on the floor of his cell began to subside. He also agrees that sleeping on the floor of his cell with his mattress is similar to sleeping on the bottom bunk, with the exception of getting up from the floor. His main difficulty with the top bunk assignment was that he could not climb to the top bunk; he never filed any grievances to prison staff about a difficulty getting up from the floor of his cell.

Furthermore, Plaintiff's allegations of "deliberate indifference" have been propounded against non-medical staff at the DCC. None of the Defendants are responsible for providing medical treatment to inmates. Plaintiff was provided access to medical staff at DCC from CMS during the time period in question, February 2006 to August 2006.

The Third Circuit case of *Durmer v. O'Carroll,* 991 F.2d 64 (3d Cir. 1993), is controlling in the instant matter. *Attached hereto as Exhibit B.* In *Durmer*, inmate Plaintiff brought a deliberate indifference action against the physician-in-charge, the Warden of a New Jersey state correctional facility, and the New Jersey Commissioner of Corrections. The Plaintiff in *Durmer* claimed that he was not receiving physical therapy, and wrote to the State Commissioner of Corrections and Warden to complain. *Id. at 66.*

"In order to succeed in an action claiming inadequate medical treatment, a prisoner must show more than negligence; he must show 'deliberate indifference' to a serious medical need." *Id. at 67.* A "deliberate indifference" claim against the defendants cannot prevail because the Defendants are not charged with providing *medical care* to the Plaintiff. The crux of Plaintiff's

claim, assignment to the bottom bunk, is not "medical treatment."

Like the Commissioner of Corrections and Warden co-Defendants in *Durmer,* the Defendants in the instant case have been sued based upon letters of complaint that were allegedly written to them. With regard to such letters of complaint, the *Durmer* Court wrote that

> The only allegations against either of these two defendants [the Warden and State Commissioner of Corrections] was that they failed to respond to two letters Durmer sent to them regarding his predicament. Neither of these defendants, however, is a physician, and neither can be considered deliberately indifferent simply because they failed to respond directly to the medical complaints of a prisoner who was already being treated by the prison doctor.

*Id at 69.* Here, in the grievance response that was received on March 8, 2006, Plaintiff was instructed to obtain and submit specific documentation (a new medical memo) to either Holman or Scarborough. The February 22, 2006 memo which Plaintiff attempted to use for his assignment to the bottom bunk, taken in the light most favorable to the Plaintiff, simply cannot be construed as a directive for DCC staff to provide a bottom bunk to the Plaintiff. This memo is illegible. Plaintiff should have requested a second memo with clear language in order to receive a bottom bunk.

Given the non-medical role of the Defendants in the instant action, and the lack of serious medical need from the Plaintiff, and inaction by the Plaintiff, any claim of deliberate indifference against the Defendants must fail. Therefore, on these facts, Defendants are entitled to summary judgment as a matter of law.

## II.    PLAINTIFF MAKES NO SHOWING OF PERSONAL INVOLVEMENT BY ANY DEFENDANT

In his Complaint, Plaintiff has failed to demonstrate personal involvement by Defendants Pierce, Scarborough or Hazzard regarding Plaintiff's inability to obtain a bottom bunk while housed in Building W.

The Third Circuit has held that a "defendant in a civil rights action must have personal involvement in the alleged wrongs; liability cannot be predicated solely on the operation of *respondeat superior*." *Rode v. Dellarciprete*, 845 F.2d 1195, 1207 (3d Cir. 1988). Personal involvement can be shown through assertions of personal direction, or actual knowledge and acquiescence. However, such assertions must be made with particularity. *Rode*, 845 F.2d at 1207.

Plaintiff has admitted that his interaction with Defendant Pierce is limited to the letter Plaintiff wrote, dated May 20, 2006, to Defendant Pierce. Defendant Pierce, in turn, forwarded Plaintiff's claim to the medical department. Plaintiff had already been advised that the proper individuals to forward his housing concerns to were Holman and Scarborough.

With regard to Defendants Scarborough and Hazzard, Plaintiff's allegations are based upon hearsay statements from other individuals that Plaintiff's messages that were supposedly passed on to either Defendant. Yet Plaintiff produced no evidence that he individually contacted either Defendant, or submitted another legible medical memo. A legible medical memo would have made Defendant Scarborough aware that Plaintiff should be assigned to a bottom bunk.

In the absence of any evidence that State Defendants Pierce, Scarborough or Hazzard personally participated in the alleged wrongful conduct (i.e., denying Plaintiff the assignment to a bottom bunk), Plaintiff has failed to state a claim and these State Defendants are entitled to judgment as a matter of law.

.

### III.    STATE DEFENDANTS ARE ENTITLED TO QUALIFIED IMMUNITY IN THEIR INDIVIDUAL CAPACITIES

To determine whether a state official is entitled to qualified immunity, the court must conduct a two-part inquiry:

> A court required to rule upon the qualified immunity issue must consider, then, this threshold question:  Taken in the light most favorable to the party asserting the injury, do the facts alleged show the officer's conduct violated a constitutional right? . . .
> If no constitutional right would have been violated were the allegations established, there is no necessity for further inquiries concerning qualified immunity.  On the other hand, if a violation could be made out on a favorable view of the parties' submissions, the next, sequential step is to ask whether the right was clearly established.

*Saucier v. Katz,* 533 U.S. 194, 201 (2001).  To be clearly established, "[t]he contours of the right must be sufficiently clear that a reasonable official would understand that what he is doing violates that right."  *Anderson v. Creighton,* 483 U.S. 635, 640 (1987).  "This inquiry, it is vital to note, must be undertaken in light of the specific context of the case, not as a broad general proposition."  *Saucier,* 533 U.S. at 201.

With respect to Plaintiff's claim of denial of access to a bottom bunk, he cannot show that he suffered actual injury, and, therefore, he cannot establish the threshold requirement that his constitutional rights were violated.

Further, the DCC staff responded to Plaintiff's complaint of not receiving a bottom bunk. The DCC staff directing Plaintiff to obtain another medical memo, and write to Scarborough or Holman.  Reasonable officials in their circumstances could not know that their conduct would present a constitutional violation.

Therefore, State Defendants are entitled to qualified immunity as a matter of law and

cannot be held liable to Plaintiffs in their individual capacities.

## IV.    UNDER THE ELEVENTH AMENDMENT, STATE DEFENDANTS CANNOT BE HELD LIABLE IN THEIR OFFICIAL CAPACITIES

"[I]n the absence of consent, a suit [in federal court] in which the State or one of its agencies or departments is named as the defendant is proscribed by the Eleventh Amendment." *Pennhurst State School & Hosp. v. Halderman*, 465 U.S. 89, 100 (1984).  This preclusion extends to state officials when "the state is the real, substantial party in interest."  *Id.* at 101 (*quoting Ford Motor Co. v. Dep't of Treasury*, 323 U.S. 459, 464 (1945)).  "Relief sought nominally against an [official] is in fact against the sovereign if the decree would operate against the latter."  *Id.* (*quoting Hawaii v. Gordon*, 373 U.S. 57, 58 (1963)).  A State may waive its Eleventh Amendment immunity.  However, such waiver must constitute an "unequivocal indication that the State intends to consent to federal jurisdiction that otherwise would be barred by the Eleventh Amendment."  *Ospina v. Dep't of Corrections*, 749 F. Supp. 572, 578 (D. Del. 1990) (*quoting Atascadero State Hosp. v. Scanlon*, 473 U.S. 234, 238 n.1 (1985)).

In this case, the State of Delaware has neither consented to Plaintiff's suit nor waived its immunity.  Therefore, under the Eleventh Amendment, State Defendants cannot be held liable in their official capacities.

WHEREFORE, for the reasons stated herein, State Defendants respectfully request that this Court grant summary judgment in their favor, in both their official and individual capacities, on all claims.

STATE OF DELAWARE
DEPARTMENT OF JUSTICE


/s/ Catherine Damavandi_____

Catherine Damavandi (ID # 3823)
Deputy Attorney General
State of Delaware
Department of Justice
820 N. French Street, 6th Floor
Wilmington, DE 19801
(302) 577-8400
Attorney for State Defendants

October 31, 2007

**CERTIFICATE OF SERVICE**

I hereby certify that on October 31, 2007, I electronically filed *Defendants'*

*Memorandum of Points And Authorities In Support of Their Motion for Summary*

*Judgment* with the Clerk of Court using CM/ECF.  I hereby certify that on October 31,

2007, I have mailed by United States Postal Service, the document to the following non-

registered party:  Dale A. Guilfoil.


  /s/ Catherine Damavandi
Catherine Damavandi (ID # 3823)
Deputy Attorney General
State of Delaware
Department of Justice
820 N. French Street, 6th Floor
Wilmington, DE 19801
(302) 577-8400
Attorney for State Defendants

Page 1

IN THE UNITED STATES DISTRICT COURT.

FOR THE DISTRICT OF DELAWARE

DALE GUILFOIL,                    )
                                  )
        Plaintiff,                )   Civil Action No.
                                  )   06-493-GMS
v.                                )
                                  )
DAVID PIERCE, et al.,             )
                                  )
        Defendant.                )

        Deposition of DALE A. GUILFOIL taken pursuant to
notice before Renee A. Meyers, Certified Realtime
Reporter and Notary Public, at the Department of
Justice, Carvel State Building, 820 North French Street,
6th Floor , Wilmington, Delaware, on Friday, September
28, 2007, beginning at approximately 2:05 p.m., there
being present:

APPEARANCES:

        DALE GUILFOIL
          Pro Se,

        DEPARTMENT OF JUSTICE
        EILEEN KELLY, ESQ.
        CATHERINE DAMAVANDI, ESQ.
          820 North French Street
          Wilmington, Delaware  19801
          for Defendant.

                    CORBETT & WILCOX
              Registered Professional Reporters
        230 North Market Street      Wilmington, DE 19899
                    (302) 571-0510
                  www.corbettreporting.com
            Corbett & Wilcox is not affiliated
          with Wilcox & Fetzer, Court Reporters

Dale A. Guilfoil

2 (Pages 2 to 5)

| Page 2 |
| --- |

1       DALE A. GUILFOIL,
2    the witness herein, having first been
3    duly sworn on oath, was examined and
4    testified as follows:
5  BY MS. KELLY:
6    Q.  Good afternoon, Mr. Guilfoil.  As I told you, I
7  am Eileen Kelly and I am representing the defendants
8  David Pierce, James Scarborough and Carl Hazzard in this
9  case.
10       Could you please state your full name for the
11  record?
12    A.  Yes.  Dale Allen Guilfoil.
13    Q.  Have you ever had your deposition taken before?
14    A.  No.
15    Q.  Let me just go over a few basics for you.  First
16  of all, we can only speak one person at a time.  The
17  court reporter can't take us down if we are both talking
18  at once.
19    A.  Yeah.
20    Q.  So wait until I am done talking and then I will
21  wait until you are done talking before we start up
22  again.
23       The other thing is that she can't take down a nod
24  or shake of the head, so you actually have to say what

| Page 3 |
| --- |

1  your answer is, if it's a yes or a no or what have you;
2  okay?  If, at any time, you don't understand a question
3  that I have asked you, let me know and I will try to
4  explain or rephrase it.  If you go ahead and answer, I
5  am going to assume that you understood.
6    A.  Okay.
7    Q.  Do you understand what I have gone over with you?
8    A.  Yes, ma'am.
9    Q.  Have you ever been known by any other names?
10    A.  No, just Dale Guilfoil.
11    Q.  Are you currently on any medication that would
12  affect your ability to testify today?
13    A.  No.  I take medication, but I don't think it's
14  going to affect it.
15    Q.  What kind of things are you taking?
16    A.  Percocet 10.
17    Q.  When was the last time you took that?
18    A.  A couple hours ago.  This morning.
19    Q.  Do you feel like having taken the Percocet is
20  going to affect your ability to remember the things you
21  are going to testify about?
22    A.  No, it shouldn't.  No.  I doubt it.
23    Q.  Will it affect your ability to understand what I
24  am asking you?

| Page 4 |
| --- |

1    A.  No.
2    Q.  Is there any other reason why you can't testify
3  today?
4    A.  No, none.
5    Q.  I had served interrogatories and request for
6  production on you and you just gave me the answers right
7  before you came in here, so I have that now and will
8  e-file it, file it electronically shortly because, as
9  you know, the discovery cutoff is the 30th in this case.
10    A.  Yes, September 30th.
11    Q.  Have you had any other civil lawsuits other than
12  this one?
13    A.  No.
14    Q.  I thought, in your complaint, you said that you
15  filed suit in Ohio?
16    A.  I had filed some stuff in court but it was
17  dismissed right away, so --
18    Q.  Do you remember what it was about?
19    A.  It was -- they charged me for a criminal activity
20  inside an institution.
21    Q.  It was a criminal case?
22    A.  Yeah.  It was more -- it was about a criminal
23  thing, but, like I said, once it got filed, the judge
24  dismissed it without prejudice, but I never carried it

| Page 5 |
| --- |

1  on.
2    Q.  I just wanted to know if you had anything like
3  this case, the case where you filed the lawsuit?
4    A.  No.  No.
5    Q.  Now, what's your date of birth?
6    A.  10/10/62.
7    Q.  And where were you born?
8    A.  Elkton, Maryland.
9    Q.  Just to clarify, I just went through your
10  discovery responses, and I saw that you have answered
11  some of the questions I am going to be asking you here
12  today, but you just have to bear with me that we are
13  going to go over some of the same territory.
14       Where are you currently living?
15    A.  778 Silver Wand Road, Middletown, Delaware
16  19799.
17    Q.  How long have you been living there?
18    A.  Just about lifetime.  I was born and raised in
19  the house.
20    Q.  And are you married?
21    A.  No.  I am single.
22    Q.  Do you have any children?
23    A.  I have one son.
24    Q.  And how old is he?

Dale A. Guilfoil

3 (Pages 6 to 9)

Page 6

1    A. He will be -- he is 20 right now.
2    Q. What's your highest education level?
3    A. I graduated high school.
4    Q. And where did you go to high school?
5    A. Middletown High.
6    Q. When did you graduate?
7    A. It was '82.
8    Q. Have you had any college?
9    A. No, never.
10    Q. What about any training for a trade or anything
11   like that?
12    A. No. I had vocational training, but, I mean,
13   some. Really nothing. I mean, I didn't finish it or
14   anything.
15    Q. What kind of jobs have you done over the years?
16    A. Mostly construction, roofing and siding and
17   framing.
18    Q. We are here today about events that happened
19   during an incarceration in 2006; is that right?
20    A. Yes.
21    Q. When was the last time you worked prior to that
22   2006 incarceration?
23    A. '95 is when I got hurt on the job, and I worked a
24   few months after that, so it was probably -- I think it

Page 7

1   was August of '95, actually. And then in December of
2   '95, I had back surgery and I haven't been back to work
3   since.
4        Excuse me. I did work one time for a temp.
5   agency, but I only worked like two days or whatever
6   because I couldn't keep up with the work, so...
7    Q. Where were you working when you were hurt on the
8   job?
9    A. A place called Warren Truss over in Newark,
10  Delaware.
11    Q. And what did you do there?
12    A. We was making prefab foreign roof trusses.
13    Q. So it was construction work?
14    A. It was sort of, yeah, where you -- we had the
15   press machines and we had to carry the lumber and put
16   wood together.
17    Q. So it was pretty physical?
18    A. Yes.
19    Q. And how did you hurt yourself?
20    A. I was lifting lumber.
21    Q. Did you fall or anything?
22    A. No. It was just when I was lifting the lumber
23   up, my back just gave out.
24    Q. And when was this?

Page 8

1    A. March 9th of '95, 1995.
2    Q. What part of your back was injured?
3    A. My lower back muscles. I went to the doctor the
4   next day, they said I had a severe lumbar strain, I
5   herniated the L4-L5, and I had nerve damage in my right
6   leg, and my, what do you call it, S.I. joint was
7   damaged, which is actually the hip joint.
8    Q. Nerve damage in your left leg?
9    A. Right leg.
10    Q. Sorry. Did you receive worker's compensation?
11    A. Yes.
12    Q. How long did that go on?
13    A. Actually, it is still sort of going on. I had --
14   they stopped my checks. I was seeing a doctor for them
15   on the 26th for them to review the file and start paying
16   me again. Because I was incarcerated, they stopped the
17   payments.
18    Q. So you just saw somebody a couple days ago about
19   this?
20    A. Yeah. Well, that was for the insurance company,
21   but I am also seeing my doctor. I have to start
22   injections in my back -- I have to go back October 5th
23   to start a series of injections to try to work things
24   out. If not, then they have to do surgery again.

Page 9

1    Q. You said you had surgery, was it in December of
2   '95?
3    A. December of '95, December 20th.
4    Q. And what kind of surgery was that?
5    A. They went in and the -- the disks are bulging, I
6   got herniated disks and they are pinching against the
7   sciatic nerve, so they went in and tried to cut the
8   herniation off, but it's back.
9    Q. Was it a diskectomy?
10    A. I am not sure exactly what they call that.
11    Q. I am not saying it right.
12        So it was surgery for the herniation?
13    A. Right. Right, the sciatic nerve and everything.
14    Q. After that surgery, were you feeling any better?
15    A. No.
16    Q. It's my understanding that after you were hurt in
17   March, you were in such discomfort that you were not
18   able to go back to work?
19    A. Right. I was on -- where I worked it, it's a lot
20   of climbing and bending and lifting and my doctors have
21   me so I can't lift over 20 pounds, no frequent twisting
22   and bending, and no climbing.
23    Q. And the surgery didn't help?
24    A. No.

Dale A. Guilfoil

4 (Pages 10 to 13)

| Page 10 | Page 12 |
|---|---|
| 1    Q. When you got hurt, you said you went to see a<br>2 doctor?<br>3    A. The very next day.<br>4    Q. And who was that?<br>5    A. I went to -- it was -- I forget the name of it,<br>6 it's at the Wilmington Hospital, it's some kind of work<br>7 program there they got the insurance company had -- they<br>8 said I had to go there first.<br>9    Q. Did you have your own personal physician, too?<br>10    A. After that. After that, I started seeing -- I<br>11 went to a Dr. Rudin, he is the one who did my surgery,<br>12 and then I started seeing Dr. Steven Beneck.<br>13    Q. Do you know how to spell that?<br>14    A. Beneck? B-e-n-e-c-k.<br>15    Q. What kind of a doctor is he?<br>16    A. Pain management. But now I transferred, now I am<br>17 seeing a Dr. Balu, who is also pain management, but he<br>18 has an office in Middletown which is closer in<br>19 transportation to me.<br>20    Q. Is that Blue, like B-l-u-e?<br>21    A. No, it's B-a-l-u?<br>22    Q. You saw a Dr. Beneck for pain management.<br>23      Did you go through any physical therapy?<br>24    A. Yeah. I have went through physical therapy and | 1    Q. You were visiting Ohio when you were arrested in<br>2 '85?<br>3    A. Yes.<br>4    Q. And you are visiting again in '96?<br>5    A. No. They extradited me back.<br>6    Q. So, in '96, you went to Ohio for an offense from<br>7 ten years before?<br>8    A. Mm-hmm.<br>9    Q. Did you serve time in Ohio?<br>10    A. About five-and-a-half years. I got out in 2002,<br>11 January of 2002, I was released and came back to<br>12 Delaware.<br>13    Q. And what was the charge, the conviction?<br>14    A. Felonious assault.<br>15    Q. And that was from '85?<br>16    A. 1985.<br>17    Q. Do you remember what facility you were in in<br>18 Ohio?<br>19    A. First, back in '96, they sent me to Allen<br>20 Correctional and then I was transferred to Lima<br>21 Correctional, L-i-m-a.<br>22    Q. So, this wasn't too long after the actual back<br>23 injury that you went back to Ohio?<br>24    A. Yeah. |

| Page 11 | Page 13 |
|---|---|
| 1 everything. I had injections in the joint, in my hip<br>2 joint and all that, but that didn't work, and all he<br>3 said was just keep staying on medication or get surgery<br>4 done, and I had just been putting it off. So then now I<br>5 started seeing another doctor, and he's saying the same<br>6 thing.<br>7    Q. So, you were hurt in '95 and this incarceration<br>8 we are talking about today was in 2006; right?<br>9    A. Right.<br>10    Q. Were you incarcerated between '95 and 2006?<br>11    A. Yes.<br>12    Q. Do you remember when that was?<br>13    A. In '96.<br>14    Q. In '96.<br>15    A. I had a violation hearing.<br>16    Q. And where did you go, what facility?<br>17    A. State of Ohio.<br>18    Q. Were you living in Ohio then?<br>19    A. No. I was on vacation but I was on parole from<br>20 Ohio from a conviction back in '86, so the violation was<br>21 just a violation hearing. It wasn't actually a<br>22 conviction.<br>23    Q. So you were visiting Ohio?<br>24    A. That was back in 1985. | 1    Q. Did you get any treatment for your back while you<br>2 were in the prison in Ohio?<br>3    A. They just told me -- they were just giving me<br>4 medication and everything. They did an MRI, and they<br>5 said my back was still herniated and still had nerve<br>6 damage.<br>7    Q. They did an MRI in Ohio?<br>8    A. Yes.<br>9    Q. What kind of medication did they give you?<br>10    A. They were just giving me like Ibuprofen and<br>11 aspirin.<br>12    Q. Did they give you any other kind of treatment for<br>13 your back?<br>14    A. They sent me to see a therapist, but since I have<br>15 already been through therapy and I knew everything, they<br>16 said there was no sense in transferring me all the<br>17 mileage back and forth three times a week and they just<br>18 told me to do what -- what I could.<br>19    Q. Were you doing exercises?<br>20    A. Yeah. They had certain back exercises for me to<br>21 do, but that just aggravated the injury.<br>22    Q. When you were in Ohio, were you -- what bunk did<br>23 you have? Did you have upper and lower?<br>24    A. I had lower bottom bunk and bottom range. There |

Dale A. Guilfoil

Page 14

1  was no going up no steps, no climbing.

2      Q.  So you were in the first level of the housing?

3      A.  Institution, yes, with a bottom bunk.

4      Q.  How long have you been using a cane?

5      A.  Since I believe it was January 2006.

6      Q.  Did someone, a physician, prescribe that for you?

7      A.  Yeah.  The doctor at -- in the DOC, Delaware

8  Correctional, Dr., I believe, Messick.

9      Q.  And that was at Delaware Correctional?

10     A.  Excuse me, Messinger is what it is.  His name is

11  Messinger.

12     Q.  Was this at Delaware Correctional Center in

13  Smyrna?

14     A.  In Smyrna, yes.  Yeah, Messinger.  He was the one

15  that also gave me the memos for the bottom bunks.

16     Q.  When your incarceration in Ohio was over, did you

17  come back to Delaware?

18     A.  Yeah.  I was released and I moved right back

19  home.

20     Q.  Are you saying that when you were incarcerated,

21  you don't get workers' comp.?

22     A.  No, not while you are working, you can't.

23     Q.  Not while you are in prison, you can't?

24     A.  Right.

Page 15

1      Q.  So, you came back to Delaware in what year?

2      A.  That was two -- I believe it was January 2002.

3      Q.  Once you were out of prison in Ohio, did you go

4  see a doctor outside of the --

5      A.  Yes.  As soon as I came back to Delaware, I

6  started seeing Dr. Beneck again.

7      Q.  And what did he do for you?

8      A.  Just -- he talked about therapy, but he said,

9  Just take the medications, and until I was tired of

10  taking all the medications, all he could do was surgery.

11     Q.  What kind of medications were you taking?

12     A.  He had me on Darvocet and Flexeril and there was

13  some type of sleeping pill to help me sleep at night.

14     Q.  What's Flexeril?

15     A.  That's a muscle relaxer.

16     Q.  Did those medicines help?

17     A.  The Darvocets helped some, you know, it took the

18  edge off of the pain, but, I mean, my back, it's just

19  been getting worse over the time.

20     Q.  So, you have pain in your lower back and you have

21  pain in your right leg as well?

22     A.  My right leg, yeah, and nerve damage in my right

23  leg, has got numbness, tingling and numbness down my

24  inside.

Page 16

1      Q.  Tingling and numbness down your right leg?

2      A.  Yes, inside of the right leg.

3      Q.  In this time period of 2002, were you seeing

4  anyone else for your back other than Dr. Beneck?

5      A.  No, just Dr. Beneck.

6      Q.  Where is he located?

7      A.  Glasgow, his office in Glasgow.

8      Q.  Were you living in Middletown then?

9      A.  Yes.

10     Q.  And you weren't working?

11     A.  No.

12     Q.  In between 2002 and the 2006 incarceration that

13  we are talking about, were you incarcerated in between

14  that time period?

15     A.  Yeah.

16     Q.  And when was that?

17     A.  2004, I was in Gander Hill prison.

18     Q.  How long?

19     A.  I think it was -- well, I was between Gander Hill

20  Prison and the Webb Correctional and then I ended up in

21  VOP in Smyrna.

22     Q.  The whole period of incarceration, how long did

23  that last?

24     A.  The one was a year.

Page 17

1      Q.  One year at Gander Hill or all three?

2      A.  All of them, it was a year.  And then -- I think

3  it was -- there was another one -- well, the one in 2006

4  when I was in Smyrna, and then I just got released again

5  because I went back for violation.  I was in Georgetown

6  this time.

7      Q.  In between 2002 and 2004, you were seeing

8  Dr. Beneck; right?

9      A.  Yeah.

10     Q.  And when you were back in prison in 2004 time

11  frame, were you getting treated while you were in

12  prison?

13     A.  Yeah.  They were giving me medications for my

14  back.

15     Q.  Do you know what kind they were giving you?  Was

16  it just over-the-counter?

17     A.  It was -- this last time, they were giving me

18  Vicodin.  When I was in Smyrna, they were giving me

19  Tylenol 3 and they were also giving me muscle relaxers.

20     Q.  During your 2004, I guess, until about 2005

21  incarceration, were you getting any care other than

22  medication?

23     A.  No.  Just the medication.

24     Q.  And what was that incarceration for in 2004?

Dale A. Guilfoil

6 (Pages 18 to 21)

---

Page 18

1    A. DUI.
2    Q. So, you were released when? 2005? Do you
3    remember when?
4    A. I think it was December, December of 2005.
5    Q. December 2005?
6    A. It was 2000 -- I did a year, so it was something
7    like that, December.
8    Q. Of 2005?
9    A. Yeah.
10   Q. But then you were -- weren't you in prison in the
11   beginning of 2006?
12   A. Yeah. Because I was only out like seven months
13   and I violated probation and got another DUI.
14   Q. So, you were out for like seven months and then
15   you returned for another DUI?
16   A. Yes.
17   Q. And when you returned for that other DUI, is that
18   when you ended up at DCC in Smyrna?
19   A. Yeah.
20   Q. And how long was that sentence for?
21   A. I ended up, violation of probation, I ended up
22   with nine months when I went to Smyrna, in 2006 --
23   actually, 2005 and through 2006.
24   Q. Do you remember when you arrived at the prison

---

Page 19

1    and in Smyrna?
2    A. It was in January of 2006.
3    Q. You have told me about, you know, the work
4    accident in '95.
5       Have you had any other kind of injuries or
6    accidents?
7    A. No.
8    Q. That's it?
9    A. That's it.
10   Q. When you arrived at the prison in Smyrna, where
11   were you housed at first?
12   A. At first, I was in the pretrial section.
13   Q. How long were you in pretrial?
14   A. I think it was like two weeks.
15   Q. And then you were moved where?
16   A. To the C building.
17   Q. Had you done your plea at that point or --
18   A. It was violation. I was back in there for 2006,
19   that was violation of probation.
20   Q. So, you were just in pretrial briefly?
21   A. Right. I went in pretrial. Then I went to --
22   well, the judge sentenced me to do the program at VOP
23   center.
24   Q. Which one?

---

Page 20

1    A. The Crest program.
2    Q. And that's in Smyrna?
3    A. Yeah, Smyrna VOP center, violation of probation.
4    Q. So, you were sentenced to do Crest?
5    A. Right.
6    Q. But they didn't have space?
7    A. No. I refused to do it.
8    Q. Why is that?
9    A. I was in there for curfew violation and he put me
10   in a drug program. I told him I didn't agree with it.
11   Q. Were you then kept in Smyrna because you wouldn't
12   do Crest?
13   A. Right. And when I violated, they raised the
14   level up, so they moved me into level five. I was there
15   approximately two weeks, and then when I got sentenced,
16   then they moved me to C building. I spent the night in
17   there and then they moved me over to what they call V
18   building.
19   Q. When you were in pretrial, did you have a bottom
20   bunk?
21   A. Yes.
22   Q. What about C building?
23   A. C, everything -- all the way up until I got to W
24   building.

---

Page 21

1    Q. And you went from V to W?
2    A. Yes.
3    Q. How long were you in V?
4    A. Approximately two weeks.
5    Q. And then you went to W?
6    A. Right.
7    Q. Do you have any idea why you were moved from C to
8    V?
9    A. Excuse me, ma'am?
10   Q. Do you have any idea of why you were moved from C
11   to V?
12   A. Yeah. My security level was lowered to minimum
13   and W is considered minimum building.
14   Q. When you arrived in Smyrna in, I guess you said
15   it was January of 2006, did you have any medical
16   documentation about your back?
17   A. No. Just from the prior conviction, I mean prior
18   being incarcerated, they had my file and they seen it.
19   Q. When you arrived in January, 2006, did you ask
20   for a bottom bunk?
21   A. Yes. When I went to pretrial, they gave it to
22   me. That day I got there, I told them, I notified them
23   that I had a medical condition and they put me on the
24   bottom bunk. Then they assigned me to see the doctor.

Dale A. Guilfoil

Page 22

1  Q. And you saw the doctor?
2  A. Yeah.
3  Q. That was Messinger?
4  A. Yes. You know -- I did have memos from the VOP
5  center when I went there. That was another thing. I
6  also had the memos, and that's why I got the bottom
7  bunk, too.
8  Q. I am sorry. You had memos at the VOP center?
9  A. Yes. When I went to VOP center, the doctor, I
10 seen a doctor there, and they assigned me the bottom
11 bunk there also.
12 Q. When was that?
13 A. I went there in October of 2005.
14 Q. And you started out at VOP?
15 A. Yeah.
16 Q. And then you went to Smyrna because you wouldn't
17 do Crest; is that right?
18 A. Well, I went to VOP to do the Crest.
19 Q. Right.
20 A. And then I refused to do that. That's when they
21 sent me over to Smyrna.
22 Q. How long were you at CVOP?
23 A. October, November, December -- close to three
24 months.

Page 23

1  Q. Were you doing Crest while you were there?
2  A. Yeah. They had me in the Crest program, yes, but
3  I told them I didn't want to be in there.
4  Q. So they moved you to level five?
5  A. Mm-hmm.
6  Q. How long is the Crest program?
7  A. Nine months, nine to 12 months.
8  Q. So you had a lower bunk when you were in the
9  Crest program?
10 A. Yep.
11 Q. And did they give you a note at CVOP about your
12 back?
13 A. Yeah. The counselors also knew it. That's,
14 like, I had permission from the counselors to stand up
15 when I needed to, because I had problems sitting long
16 periods of time and no standing on, you know, long
17 periods of time. So everybody there knew it.
18 Q. By the way, if you need a break, you just let me
19 know; okay?
20 A. Okay.
21 Q. It's not an endurance test.
22    When you showed up -- I guess what I am trying to
23 find out is when you showed up at Delaware Correctional
24 Center, did you have, like, some kind of a note with you

Page 24

1  saying --
2  A. Yeah. I had a memo, I am pretty sure I put that
3  in here --
4  Q. You are looking at your complaint; right?
5  A. Right. That was 2/20/06, that's when I was in
6  Smyrna, because there was another one also. I am pretty
7  sure it's in here. I might not have. I still have it,
8  though. Yeah, 12/12/05.
9  Q. And this is attached to the complaint?
10 A. Yes, special needs referral. I showed that to
11 them when I got there to Smyrna. It's Exhibit A, the
12 first one.
13 Q. 12/12/05. And this piece of paper came from
14 Central Violation of Probations?
15 A. Yes. It's supposed to be a normal DOC form that
16 they use. I know in Georgetown prison, they use it.
17 Q. So, initially, you were put in a bottom bunk?
18 A. Right.
19 Q. And then you were moved to W building?
20 A. Right.
21 Q. And where were you housed in W building?
22 A. B tier, cell four.
23 Q. B tier on the first or second floor?
24 A. It's on the second floor, but it's only a few

Page 25

1  steps.
2  Q. And you were put in an upper bunk?
3  A. Yes.
4  Q. The cell that you were put in, did you spend the
5  whole time in that cell until you left Smyrna?
6  A. The same cell.
7  Q. And could you describe for me what it looked
8  like? Do you know the dimensions of the room?
9  A. It's like a four by ten. As you walk in the
10 door, the bunks are to the right and the desk is in the
11 corner. There is no stool -- some cells have the
12 stools, but that one was not on the floor. That's why I
13 laid my mattress down underneath the window and slept on
14 the floor.
15 Q. Is there a toilet in there or do you use a
16 community?
17 A. No. The toilet is down the hallway.
18 Q. So you would have a desk and the two bunks?
19 A. Yes.
20 Q. Do you know how high off the ground the upper
21 bunk is?
22 A. I think it was 54-and-a-half inches, I believe it
23 was. I measured it. I got it in the --
24 Q. I think that's what you have in your complaint?

Dale A. Guilfoil

8 (Pages 26 to 29)

| Page 26 | Page 28 |
|---|---|
| 1  A. Yeah, 54-and-a-quarter, excuse me. | 1  at? |
| 2  Q. And there is no ladder; right? | 2  A. Yeah. |
| 3  A. No. No ladder. No stool. No way to climb. | 3  Q. The Exhibit A, I think it was? |
| 4  Q. No stool. If you had a stool, is it attached to | 4  A. There is two of them. There is another one also |
| 5  the ground or can you move it around? | 5  on B. I believe B is the one I showed them. The other |
| 6  A. No. It's attached to the ground and it's away | 6  one, I believe, was on two -- I know there was two of |
| 7  from the bunks. | 7  them. That's the one memo. I just seen it. It was |
| 8  Q. And there is a mattress on the bunk; right? | 8  issued 2/20/06. |
| 9  A. (Witness nods.) | 9  Q. When did you move into W? |
| 10  Q. And what kind of mattress is it? | 10  A. 2/14. I showed him the first memo is what it |
| 11  A. There is this -- like a vinyl mattress, probably | 11  was, and he said I needed the memo, new one, that's why |
| 12  maybe about two-inches thick. | 12  I went back, and on 2/20, I got a new memo. I went back |
| 13  Q. Is it attached to the bunk or can you move it? | 13  and showed him that one, and, again, he said it's no |
| 14  A. No. You can move them. | 14  good because it's only signed by the doctor. |
| 15  Q. The bunk, itself, what's that made out of? | 15  Q. Did he tell you who it needed to be signed by? |
| 16  A. Metal, iron. | 16  A. He said Scarborough, I believe he said |
| 17  Q. So the mattress is sitting on a flat metal | 17  Scarborough is the only one that can assign bottom |
| 18  surface? | 18  bunks. |
| 19  A. Right. | 19  Q. Who is Scarborough? |
| 20  Q. And you are able to remove the mattress from the | 20  A. He is a deputy warden or -- no, wait a minute. |
| 21  bunk? | 21  Maybe he is just a major, I believe, or something like |
| 22  A. (Witness nods.) Yes, ma'am. | 22  that. He is in charge of security or something like |
| 23  Q. That's yes? | 23  that. |
| 24  A. Yes. | 24  Q. But Sergeant Bailey told you that he was the one |

| Page 27 | Page 29 |
|---|---|
| 1  Q. When you arrived at W building, and you were put | 1  that needed to sign off? |
| 2  in the upper bunk, did you say anything to anybody? | 2  A. Right. So then I filed a grievance. |
| 3  A. That first night I did. I went down to -- it's | 3  Q. Let's go back a little bit. You got a memo, and |
| 4  supposed to be a lieutenant on the second shift because | 4  that was from medical? |
| 5  I was moved in the afternoon and told them that I had a | 5  A. Right. |
| 6  memo and everything. They said I had to wait until the | 6  Q. How did you get that? |
| 7  next day to talk to a sergeant that's on first shift. | 7  A. Went by and seen the doctor. |
| 8  Q. Do you remember who the lieutenant on second | 8  Q. Did you put in a sick call slip? |
| 9  shift was? | 9  A. Yes. I went back and seen the doctor. Medical |
| 10  A. No. I don't remember. It was a female I talked | 10  said that the memos were faxed to Captain Hazzard and |
| 11  to. | 11  Scarborough, which are the ones that take care of the |
| 12  Q. And the next day, who did you talk to? | 12  medical bottom bunks. |
| 13  A. I talked to a Sergeant Bailey. | 13  Q. Who did you see in medical when you went the |
| 14  Q. And you told him that you needed -- | 14  first time in Smyrna? Was that Dr. Messinger? |
| 15  A. Bottom bunk. | 15  A. I think it was. I believe -- yeah. I believe it |
| 16  Q. And what did he say? Is that a woman or a man? | 16  was the same doctor. Sometimes they switched doctors, a |
| 17  A. He is a man. | 17  couple different doctors I seen. They had me seeing a |
| 18  Q. What did he say? | 18  doctor every three months. That was Dr. Messinger also. |
| 19  A. He said he had to see the memo. | 19  Q. And he is the one that wrote that note. And what |
| 20  Q. And you didn't have one? | 20  exhibit is that? |
| 21  A. No. I showed him a copy of the memo. They said | 21  A. Exhibit C. |
| 22  the memos were no good because they were only signed by | 22  Q. That's the Exhibit C to your complaint, just to |
| 23  the doctor. | 23  be clear? |
| 24  Q. Is the memo the documents we were just looking | 24  A. Yes. |

Dale A. Guilfoil

Page 30

1    Q. And you saw him on February 20?
2    A. Right.
3    Q. And between the 14th and the 20th, you were --
4    A. Sleeping on the floor.
5    Q. So, did you put the mattress on the ground?
6    A. Right. I put the mattress right on the floor and
7    slept on it.
8    Q. Were you not able to get up to the top?
9    A. Yeah. It's just hard -- I mean, like I said, I
10   had nerve damage and everything, and it's just -- any
11   type of climbing or anything just causes more pain, so I
12   just -- they told me to avoid climbing.
13   Q. And Dr. Messinger gave you the note, and then you
14   gave it to who?
15   A. I showed it to Sergeant Bailey.
16   Q. And Sergeant Bailey was who, in reference to your
17   housing unit?
18   A. He is first shift sergeant in charge of the
19   building.
20   Q. And that would be during the day?
21   A. During the daytime.
22   Q. When Sergeant Bailey said it needed to be signed
23   by Scarborough, was it?
24   A. Yes.

Page 31

1    Q. What did you do then?
2    A. That's when I filed the grievance.
3    Q. And the grievance is exhibit --
4    A. I believe there is three grievances, actually.
5    The first one is B1.
6    Q. Right. B2?
7    A. Exhibit D.
8    Q. Exhibit B1 and B2 are the grievances?
9    A. Yeah. B1, B2, and then Exhibit D.
10   Q. Oh, D, you said?
11   A. Right. Because it was after I got the memo and
12   everything else.
13   Q. And the first grievance was filed when?
14   A. 2/15/06.
15   Q. Who did you give the grievance to?
16   A. They have a box on the wall for -- to put the
17   grievances in. It has a lock on it so only the hearing
18   officer or sergeant, whoever takes care of it, picks
19   them up.
20   Q. Did you hear back about the grievance?
21   A. Yeah, on 3/8/06.
22   Q. And what was the response?
23   A. On the back, it says, "You need to submit a sick
24   call slip. If medical feels you need a bottom bunk,

Page 32

1    they will send a memo to the security chief for
2    approval."
3    Q. I forgot to ask you about something that you had
4    said before. You had said something about the doctor
5    telling you he had faxed something?
6    A. The nurses did.
7    Q. Do you remember when that was? That was --
8    A. That was on 2/20, when I picked up the other
9    memo, yeah.
10   Q. Did you carry the memo with you or did the doctor
11   keep it?
12   A. No. I carried one. I had carried one with me.
13   Q. And then the nurses said they had faxed it to
14   Scarborough?
15   A. Yes. They said they had to fax it to the chief
16   of security, which I believe is Scarborough, and then,
17   also, I went and talked to Captain Hazzard, which is in
18   charge of the buildings, and he told me to get the memo
19   and show it to him and I would be moved.
20   Q. When did you talk to Captain Hazzard?
21   A. Let me see when it was. February 28th, I spoke
22   to Captain Hazzard outside in the yard. He was walking
23   through.
24   Q. You are getting that from your complaint?

Page 33

1    A. Right.
2    Q. February 28th, you talked to Captain Hazzard.
3    And what did you say to him?
4    A. He said, If you get a memo and he gets a copy of
5    a memo, then I will be moved.
6    Q. What did you say?
7    A. I followed him, I said, Well, the nurses said
8    they faxed you one. And I said, I got a copy of it
9    already and nothing was done.
10   Q. Did you give him a copy of it?
11   A. I showed him the copy I had.
12   Q. So you showed him what you had?
13   A. Right.
14   Q. And what did he say?
15   A. He said that he would check on it.
16   Q. And then you got the actual grievance response
17   back March 8th?
18   A. Yeah.
19   Q. That's what you said. And in that new time, you
20   were sleeping on the mattress on the floor?
21   A. Right. Also, on March 6th, an Officer Spriggs,
22   works second shift, she come up and said that I
23   shouldn't be sleeping on the floor. And she got a -- I
24   showed her the memo. She sent -- she said she sent a

Dale A. Guilfoil

10  (Pages 34 to 37)

Page 34

1    fax of a copy of the memo to Captain Hazzard on that day
2    also.
3        Q. Officer Spriggs?
4        A. Spriggs, yes, S-p-r-i-g-g-s.
5        Q. Did she say why you shouldn't be sleeping on the
6    floor?
7        A. Yeah. She just said, You shouldn't be sleeping
8    on the floor, nobody should. Actually, it's sort of, I
9    guess, a policy. Nobody is supposed to be on the floor
10   down there or whatever. I told them -- I said, I am not
11   climbing, and I showed them the memo. They said, Well,
12   you are supposed to have the bottom bunk, but they
13   couldn't get me moved to it.
14       Q. You had a cell mate, I take it?
15       A. Yes.
16       Q. Did you ask him to switch?
17       A. Yeah. It's against the rules. If you get caught
18   sleeping in a bed not assigned to you, they consider
19   that a violation of the rules.
20       Q. After you talked to Officer Spriggs, did you hear
21   anything back from anyone?
22       A. No. No, not right away. Nothing, really. And
23   then in April, on April 9th, that's when I wrote a
24   letter to Scarborough, and I never really got a response

Page 35

1    back from him.
2        Q. Is that one of your exhibits?
3        A. No, because I don't have the letter.
4        Q. He didn't respond, is that what you are saying?
5        A. No.
6        Q. What else did you do?
7        A. On the 24th, I filed another grievance.
8        Q. And that's Exhibit D?
9        A. Yeah.
10       Q. And at that point, you had heard back from your
11   first one?
12       A. Yeah. This one, they said that the matter was
13   not a grievable matter.
14       Q. That's for the April 24th grievance?
15       A. Yeah, D. Actually, that was the third grievance
16   I filed.
17       Q. And the response was on the back of Exhibit D
18   that approval was issued by Major Holman or Scarborough?
19       A. Yes. It said that medical can only request that
20   you receive a bottom bunk and it has to be approved by
21   the DOC staff.
22       Q. Do you know when you got back your response to
23   your grievance?
24       A. I believe I wrote it on here. Received 6/7/06.

Page 36

1    That's in the left-hand corner. You should have a copy
2    of that also on your copy.
3        Q. Is it in your handwriting?
4        A. Yes.
5        Q. I see it. After April 24, when you filed your, I
6    guess it was your third grievance, did you do anything
7    else, have any other conversations?
8        A. Yeah. I wrote another letter to deputy warden.
9    I went back -- okay, 24th, I received that back. I
10   wrote on the May 20th, I wrote to Deputy Warden Pierce.
11       Q. And that's Exhibit E1?
12       A. E1 and 2. He forwarded the letter to the nurse
13   named Eleanor, the director of nursing. They sent it to
14   the outside office, which Mr. Altman, who was with
15   Correctional Medical Services, and they sent me a letter
16   back stating that the memo was there, they were good,
17   and it was up to the DOC staff to assign the bottom --
18   who were not following the memos.
19       Q. And the letter from Mr. Altman is Exhibit F?
20       A. Exhibit F, right.
21       Q. And his letter is dated July 7, 2006?
22       A. Yes.
23       Q. Did you, up until July 7, 2006, did you have any
24   other conversations with anybody that you recall?

Page 37

1        A. I spoke to several officers. I spoke to a
2    Lieutenant Watkins and an Officer Givens on second
3    shift.
4        Q. Officer who?
5        A. Givens, and Lieutenant Watkins. They tried to
6    get me moved. They made phone calls up front, to the
7    count office and so forth. What they told me was that
8    my memos were sent up front and -- but I couldn't be
9    moved.
10       Q. Did they tell you why?
11       A. They said that's all they could say. So I am
12   taking what they meant by "up front" was to Scarborough
13   and deputy warden.
14       Q. Do you remember when, about, you had
15   conversations with those individuals?
16       A. No. I don't remember exact date.
17       Q. After July 7, 2006, what else happened?
18       A. Excuse me now?
19       Q. After July 7th, 2006, did you have any more
20   discussions with anybody about your situation?
21       A. No. I mean, several officers -- going back to
22   medical, I had to see medical every 30 days for the
23   medication, and every time I seen them, I told them I
24   still don't have a bottom bunk, and they are saying the

Dale A. Guilfoil

11 (Pages 38 to 41)

Page 38

1  memos were sent up front and they don't know why I
2  wasn't moved, I should have been moved, and they are not
3  -- and other than that, I mean, that was it. I mean,
4  there was nothing else.
5       I mean, I even had an officer threaten to put me
6  in the hole if I didn't stop sleeping on the floor. I
7  said, I will pack my stuff, let's go. Then they said
8  they were going to leave it alone. After they came
9  back, they said, We are just going to leave you where
10 you are at, because I showed them the memos I had.
11      Q. Was your housing tier full? Were all the cells
12 full with two?
13      A. The cell that I was in, I was in there
14 approximately from February until I believe August, and
15 the bottom bunk became available three times.
16      Q. Not in your cell?
17      A. In my cell.
18      Q. The bottom bunk became available?
19      A. The bottom bunk became available three times.
20      Q. So I guess cell mates came and went?
21      A. Well, they left. They were transferred out and
22 new ones were transferred in.
23      Q. So, for example, you had somebody sleeping on the
24 bottom bunk and he would be transferred elsewhere and

Page 39

1  the bunk would be empty.
2       A. Yes.
3       Q. And then they put somebody else in there?
4       A. Right.
5       Q. Do you remember the names of any of your cell
6  mates that were there and left?
7       A. I have them written down. I don't -- it's hard
8  for me to remember names a lot. I do have the
9  information written down.
10      Q. If you could mail that information to me, that
11 would be helpful.
12      A. Okay. Yeah. I asked for a copy of the list, I
13 thought they kept a list of who was moved where, but in
14 your reply back, you said there is nothing --
15      Q. That's right. When, for example, when one of the
16 cell mates left on the bottom bunk, would you say to an
17 officer --
18      A. I went to them and they said I couldn't be moved.
19      Q. While you were in your, sleeping on the floor on
20 the mattress, you were still going to medical, you said,
21 every 30 days; is that right?
22      A. Every 30 days, yes, I went back for medication.
23      Q. What kind of medications were you taking then?
24      A. They had me on Tylenol 3s and muscle relaxer.

Page 40

1       Q. How often would you take that?
2       A. Twice a day.
3       Q. Would you take both of them twice a day?
4       A. The muscle relaxers just at night -- well, wait a
5  minute. Wait a minute. Yeah, I believe it was both
6  during -- yeah. I believe it was, yeah, at that time,
7  because they switched the medication up back and forth.
8       Q. Were they doing anything else for you health wise
9  for your back?
10      A. No. They said they were doing everything other
11 than therapy, but with the amount of time that I had,
12 they really -- if you don't have a whole lot of time,
13 over a year or more, they don't go out of the, you
14 know --
15      Q. Your sentence was a year?
16      A. No. I only had --
17      Q. Nine months?
18      A. Yeah, nine months.
19      Q. Eventually, you were moved out of W building?
20      A. Yes. I went to CVOP.
21      Q. And do you remember when that was?
22      A. I am thinking it was towards the end of August or
23 beginning of September. I am not sure exact date.
24      Q. Why did you go to CVOP?

Page 41

1       A. I was -- my sentence ended and I was sentenced to
2  home confinement or work release, so they sent me to VO
3  because that's level four and the Smyrna prison is level
4  five.
5       Q. When you went to CVOP, were you put in a bottom
6  bunk?
7       A. Yes.
8       Q. That facility is all on one floor; right?
9       A. Yeah. It's a single --
10      Q. So there is no stairs?
11      A. No stairs.
12      Q. And did they treat you medically for your back at
13 CVOP?
14      A. Just the medication I was taking.
15      Q. When were you released from CVOP?
16      A. December 3rd.
17      Q. Of 2006?
18      A. Yes.
19      Q. When you were released in December, 2006, did you
20 go to any medical treatment for your back?
21      A. Yes. I started seeing Dr. Balu. Well, I made an
22 appointment with Dr. Beneck, and because of my
23 transportation, I just started seeing Dr. Balu in
24 Middletown.

Dale A. Guilfoil

12 (Pages 42 to 45)

| Page 42 | Page 44 |
|---|---|
| 1   Q. Because Dr. Beneck was in Glasgow, you said? | 1   Q. And you are allowed to have the cane in the |
| 2   A. Yeah. | 2   housing unit in W building? |
| 3   Q. So you started seeing this other type of doctor | 3   A. Yes. |
| 4   in Middletown? | 4   Q. Have you been using the cane since then, since it |
| 5   A. Yes. | 5   was given to you? |
| 6   Q. What kind of doctor is he? | 6   A. Yeah. More or less, yes. |
| 7   A. He is pain management also. | 7   Q. Were you allowed to have it at SVOP and CVOP? |
| 8   Q. And what kind of things did he do for you? | 8   A. Mm-hmm. |
| 9   A. They started me on medication and wanted me to | 9   Q. So you moved over to SCI, the prison in |
| 10   start therapy, but then I got violated again, and that's | 10   Georgetown, level five? |
| 11   when I just got out. | 11   A. Right. |
| 12   Q. What kind of medication were you taking? | 12   Q. And you were there until recently; is that right? |
| 13   A. Percocet 10. | 13   A. Yes. |
| 14   Q. How long were you out of prison, or, not prison, | 14   Q. You were released when? This month? |
| 15   but CVOP before you were violated again? | 15   A. September 1st. |
| 16   A. Seven weeks, I believe it was. | 16   Q. Did you get any treatment for your back at SCI? |
| 17   Q. And what was the violation for? | 17   A. Just the -- I had the cane, memos for bottom |
| 18   A. Dirty urine. | 18   bunks, and they gave me medication. |
| 19   Q. And you received some type of sentence? | 19   Q. Did they give you your bottom bunk? |
| 20   A. Nine months. | 20   A. Yes. |
| 21   Q. And it looks like you would have gone back when, | 21   Q. What kind of medications did you get? |
| 22   in February 2007? | 22   A. I was getting Vicodin three times a day. |
| 23   A. Actually, it was January 25th, and they sent me | 23   Q. Did they do anything else for you medically? |
| 24   to Sussex Correctional -- I mean Sussex VOP Center. | 24   A. At nighttime, they gave me, I think it was called |

| Page 43 | Page 45 |
|---|---|
| 1   Q. And how long were you there? Were you there the | 1   Robaxin, it's a muscle relaxer. That was to help me |
| 2   whole time? | 2   sleep at night because I have a problem, when I roll |
| 3   A. No. I think it was like two weeks, and then I | 3   over in my sleep, I wake myself up because of the pain, |
| 4   was moved to Sussex Correctional Institution. | 4   so I take medication for that. |
| 5   Q. Do you know why you were moved? | 5   Q. Did they make you do any kind of physical work at |
| 6   A. Yeah. I went to level five. He sentenced me to | 6   SCI? |
| 7   level five. I told him I didn't want anymore probation, | 7   A. No. |
| 8   I just wanted to end everything. I told him to give me | 8   Q. And I know you were just released from SCI |
| 9   my level five time. | 9   recently, but have you been to see a doctor? |
| 10   Q. When you were at Sussex Violation of Probation | 10   A. Yes. I seen Dr. Balu on the 14th. Then I seen |
| 11   Center, were you on a bottom bunk? | 11   him again on the 26th. I also had an MRI done, I think |
| 12   A. Yes. | 12   that was the 19th, and I seen another doctor for the |
| 13   Q. Those are like dormitories; right? | 13   work comp. doctor on the 26th. I had two appointments |
| 14   A. They are like a dorm, yeah. | 14   that day. |
| 15   Q. They make you work there; right? Did you have to | 15   Q. Do you know who the workers' comp. doctor was |
| 16   work while you were there? | 16   that day? |
| 17   A. One day, they sent me out. And they asked me if | 17   A. Gelman. |
| 18   I actually wanted to go out, and I told them I would go | 18   Q. Gelman? |
| 19   out and try to do what I can but I just sat in the van | 19   A. Dr. Gelman, yes. |
| 20   with the driver. I didn't actually do anything. | 20   Q. What is Dr. Balu, what's he doing for you? |
| 21   Q. When were you given the cane? | 21   A. He is the one -- he ordered the MRI because they |
| 22   A. In -- I believe it was in January '06. | 22   wanted to see what was going on, and I went and saw him |
| 23   Q. Was that Dr. Messinger? | 23   on the 26th, he was giving me medication, but now they |
| 24   A. Yeah, Dr. Messinger. | 24   ordered to have an injection done. I have a series of |

Page 46

1 three injections coming up. The first one is October
2 5th. They want to do them each at different times
3 because they have to go deeper into my body and in
4 different spots.
5     Q. Do you know what kind of injections these are?
6 Are these spinal blocks or what do you call them?
7     A. I am not sure exactly what they are. He just
8 said one of them is going to be into the joint in my hip
9 joint, one is going to be up underneath the tailbone,
10 and one is going to be in the actual nerve of my leg.
11     Q. Do you know who is going to do that?
12     A. I believe he is going to do it himself. He says
13 he does it at his office.
14     Q. What did the MRI show; do you know?
15     A. That I got displacement at L4-L5, I guess it's
16 still herniated, and there is a lot of scar tissue.
17     Q. Has he prescribed medication for you?
18     A. Yes. I am on medication now. I take -- he gave
19 me Percocet 10s and Vicodin to take on a good day in
20 between and Zanaflex.
21     Q. What's that?
22     A. It's a muscle relaxer. Can we take a break for a
23 minute?
24         (Recess taken.)

Page 47

1 BY MS. KELLY:
2     Q. Mr. Guilfoil, let's see if we can wrap this up.
3 Not too much longer.
4     Since '95, when you had your injury --
5     A. '85 -- no, '95, you are right. I am sorry.
6     Q. Has your back ever gotten better?
7     A. No.
8     Q. And we have talked about a number of doctors here
9 today.
10     Is there any other doctors you have seen for your
11 back that we haven't talked about?
12     A. I believe I mentioned Dr. Rudin. He is the one
13 that actually did my surgery. There was another doctor
14 I had to see for the insurance company right after the
15 surgery, but it's been so long ago, I don't remember.
16     Q. When your grievance was rejected -- you filed
17 several grievances about the bunk issue, did you appeal
18 that decision?
19     A. No. They said I couldn't appeal it because of
20 the way it was written back.
21     Q. Did you ever talk to the grievance officer?
22     A. No. She never spoke to me at all.
23     Q. You are not under any kind of supervision with
24 the Department of Corrections now, are you? You are not

Page 48

1 on parole or anything?
2     A. Nothing.
3     Q. You have named David Pierce as one of the
4 defendants in the lawsuit.
5     A. Yes.
6     Q. Why don't you tell me why you named him in this
7 case?
8     A. Well, I wrote him -- he is the deputy warden. I
9 wrote him, explaining to him what the problem was and
10 telling him they are telling me the memos are no good
11 because they are only signed by a doctor and he is in
12 charge of everything there. I mean, he forwards the
13 letter to the nurse and the nurse sent it to outside. I
14 mean, I believe he should have found out, you know, or
15 done something since he is their supervisor or whatever.
16     Q. Did you ever meet him?
17     A. No.
18     Q. You never spoke with him?
19     A. No. I never Mr. Scarborough either.
20     Q. Is there anything else you want to tell me about
21 Deputy Warden Pierce?
22     A. No. I mean, like I said, that's all.
23     Q. And did you just say you never met Scarborough
24 either; is that what you just said?

Page 49

1     A. No. I never met him.
2     Q. Why have you named him in this lawsuit?
3     A. Because, according to the memos, I wrote to him
4 myself, plus I -- the department of -- the nursing
5 department said they faxed the information to him, and
6 the grievances said it -- he is the one -- the one that
7 signs for it. Like I said, I wrote to him and he never
8 even responded back to the letter.
9     Q. What about Carl Hazzard, why have you sued him?
10     A. Because I spoke to him and I showed him a copy of
11 the memo and he said he was going to check on it and
12 nothing was ever done.
13     Q. How many times did you speak to him?
14     A. Just the one time, I believe it was.
15     Q. You already told me about that; right?
16     A. Right.
17     Q. Was there anything else you want to tell me about
18 Hazzard?
19     A. No. That's all I can say. Other than, like I
20 said, the officer, that one correctional officer, she
21 said she sent him, faxed him a copy of the memo also.
22     Q. Who was that again?
23     A. Officer Spriggs, on March 6th, she said she sent
24 Captain Hazzard, faxed him a copy of the memo again, an

Dale A. Guilfoil

14  (Pages 50 to 53)

| | Page 50 |
|---|---|
| 1 | still nothing was done. |
| 2 | Q.  In this lawsuit, you are claiming that you have |
| 3 | been injured by these defendants that you sued; is that |
| 4 | right? |
| 5 | A.  They caused me more pain and suffering because of |
| 6 | having to climb up and down off the floor and so forth. |
| 7 | Instead of being able to have a bottom bunk where I |
| 8 | could just sit down on the bunk, I had to get down on |
| 9 | the floor, then had to climb back up, I mean get back |
| 10 | up, and it's -- |
| 11 | Q.  Do you mean climbing up into the top bunk? |
| 12 | A.  No.  Just getting up off the floor.  And then, |
| 13 | again, I had to sleep on the floor, you know, and I |
| 14 | should have been able to sleep in a bed. |
| 15 | Q.  Is the floor harder than the actual bunk? |
| 16 | A.  Not really, but it's just down, you know, on the |
| 17 | ground and everything. |
| 18 | Q.  Did sleeping on the floor, on the mattress, did |
| 19 | that make your back feel worse? |
| 20 | A.  Sleeping on the hard actually did, but I guess it |
| 21 | wouldn't have been much difference between the metal or |
| 22 | the floor. |
| 23 | Q.  I am sorry, I can't remember what you said.  Did |
| 24 | getting up and down from the floor make your back feel |

| | Page 52 |
|---|---|
| 1 | Q.  Is there anybody else that you might maybe call |
| 2 | as a witness at trial that knows about the facts? |
| 3 | A.  I would have to speak to them directly to see if |
| 4 | they are willing to come before I actually, you know, |
| 5 | say that. |
| 6 | Q.  So what you need to do is, once you determine |
| 7 | that, you need to pass that information on. |
| 8 | A.  Right.  Once we go to summary judgment, I mean, |
| 9 | if this is actually going to go to trial, then I will be |
| 10 | able to get more information and things. |
| 11 | Q.  I can't remember, I think I may have asked you |
| 12 | this already, too, in the interrogatories:  You haven't |
| 13 | hired an expert yet; right? |
| 14 | A.  No.  No expert yet. |
| 15 | Q.  This is your opportunity today to say whatever it |
| 16 | is that you want to say about your case, and I have |
| 17 | asked you a lot of questions. |
| 18 | Is there anything else you want to tell me about |
| 19 | your lawsuit while you are here? |
| 20 | A.  No.  I will leave it at that, like it is. |
| 21 | Q.  Procedurally, where the case is at is the |
| 22 | discovery cutoff is the 30th, which is actually the |
| 23 | weekend, and there is a summary judgment brief due |
| 24 | October 31st, that's our brief, and then you respond, |

| | Page 51 |
|---|---|
| 1 | worse? |
| 2 | A.  Yes.  It aggravated my injury.  That's when I |
| 3 | actually -- I mean -- |
| 4 | Q.  How so?  Describe it for me. |
| 5 | A.  It just causes more pain.  I mean, I don't know, |
| 6 | it just causes more pain.  I don't know how you would |
| 7 | describe that. |
| 8 | Q.  Once you were at CVOP in a bottom bunk, was your |
| 9 | back feeling the way it had been before you got to W |
| 10 | building? |
| 11 | A.  No.  Actually, after about a week, week and a |
| 12 | half, whatever, it started feeling, you know, it wasn't |
| 13 | as bad. |
| 14 | Q.  So once you were at CVOP and back in a bottom |
| 15 | bunk, it improved? |
| 16 | A.  Right. |
| 17 | Q.  I mean, it wasn't good, it wasn't -- |
| 18 | A.  No.  I mean, it wasn't a great big difference, |
| 19 | but it was a difference. |
| 20 | Q.  I think I may have asked you this in |
| 21 | interrogatories, you have told me today about a number |
| 22 | of people who you talked to and who have information |
| 23 | about your case, like the couple of officers, Givens? |
| 24 | A.  Yeah.  They are named in the complaint, yes. |

| | Page 53 |
|---|---|
| 1 | etcetera.  As I told you, Catherine Damanvandi, who is |
| 2 | here with me today, is going to be taking over the case. |
| 3 | You will get paperwork about that.  You don't need to |
| 4 | remember her name right now unless you want to know. |
| 5 | A.  I am bad with names. |
| 6 | Q.  You have the option today, if you would like to |
| 7 | do so, of having a chance to read over your transcript |
| 8 | to see if there is any mistakes or anything that you |
| 9 | want to change; would you like to do that? |
| 10 | A.  No.  I believe it's okay. |
| 11 | Q.  You want to waive that right? |
| 12 | A.  Yeah.  I will waive it. |
| 13 | Q.  And the address that I have been communicating |
| 14 | with you at is your address and you are going to be |
| 15 | there for a little while? |
| 16 | A.  Yes. |
| 17 | Q.  If you move, you have to let the Court know. |
| 18 | A.  No.  I own the home so I don't plan on moving for |
| 19 | a while. |
| 20 | MS. KELLY:  I don't think I have anything |
| 21 | else for you today. |
| 22 | (Presentation, reading, and signing were |
| 23 | waived.) |
| 24 | (The deposition was concluded at 3:15 p.m.) |

Page 54

1        - - - - -
2            INDEX TO TESTIMONY
3
    DALE A. GUILFOIL                    PAGE
4
5    Examination by Ms. Kelly              2
6
        - - - - -
7
8        INDEX TO EXHIBITS
9                            PAGE
10
    (There were no exhibits marked for identification.)
11
12
13
14
15
16
17
18
19
20
21
22
23
24

Page 55

1            C E R T I F I C A T E
2    STATE OF DELAWARE:
                    :
3    NEW CASTLE COUNTY:
4        I, Renee A. Meyers, a Registered Professional
5    Reporter and Notary Public, within and for the County
6    and State aforesaid, do hereby certify that the
7    foregoing deposition of DALE A. GUILFOIL, was taken
8    before me, pursuant to notice, at the time and place
9    indicated; that said deponent was by me duly sworn to
10   tell the truth, the whole truth, and nothing but the
11   truth; that the testimony of said deponent was correctly
12   recorded in machine shorthand by me and thereafter
13   transcribed under my supervision with computer-aided
14   transcription; that the deposition is a true record of
15   the testimony given by the witness; and that I am
16   neither of counsel nor kin to any party in said action,
17   nor interested in the outcome thereof.
18       WITNESS my hand this 3rd day of October A.D.
19   2007.
20
21
     _____
     RENEE A. MEYERS
22       REGISTERED PROFESSIONAL REPORTER
         CERTIFICATION NO. 106-RPR
23   (Expires January 31, 2008)
24



991 F.2d 64

Page 1

991 F.2d 64
**(Cite as: 991 F.2d 64)**

▷
Durmer v. O'Carroll
C.A.3 (N.J.),1993.

United States Court of Appeals,Third Circuit.
Joel E. DURMER
v.
Dr. J. O'CARROLL, M.D.; Robert C. Barker;
William Fauver,
Joel Durmer, Appellant.
**No. 92-5068.**

Argued Sept. 17, 1992.
Decided March 30, 1993.

Prisoner brought civil rights action alleging that physician-in-charge at state correctional facility, warden of state correctional facility, and Commissioner for Corrections violated his civil rights through their deliberate indifference to his medical needs during his period of incarceration. The United States District Court for the District of New Jersey, Garrett E. Brown, Jr., J., granted summary judgment in favor of defendants and prisoner appealed. The Court of Appeals, Stapleton, Circuit Judge, held that: (1) genuine issue of material fact existed as to whether physician-in-charge knew that prisoner should receive physical therapy and deliberately failed to provide it for nonmedical reasons, and (2) warden and Commissioner, neither of whom were physicians, could not be considered deliberately indifferent simply because they failed to respond directly to medical complaints of prisoner who was already being treated by prison doctor.

Affirmed in part, reversed in part, and remanded.

Scirica, Circuit Judge, filed separate dissenting opinion.
West Headnotes
**[1] Federal Courts 170B ☞766**

170B Federal Courts

170BVIII Courts of Appeals
170BVIII(K) Scope, Standards, and Extent
170BVIII(K)1 In General
170Bk763    Extent    of    Review
Dependent on Nature of Decision Appealed from
170Bk766 k. Summary Judgment.
Most Cited Cases
Court of Appeals' review of grant of summary judgment is plenary.

**[2] Prisons 310 ☞17(2)**

310 Prisons
310k17 Maintenance and Care of Prisoners
310k17(2) k. Medical and Mental Care. Most Cited Cases

**Sentencing and Punishment 350H ☞1546**

350H Sentencing and Punishment
350HVII Cruel and Unusual Punishment in General
350HVII(H) Conditions of Confinement
350Hk1546 k. Medical Care and Treatment. Most Cited Cases
(Formerly 110k1213.10(3))
Although prison systems have duty to provide prisoners with adequate medical care, simple medical malpractice is insufficient to present constitutional violation and prison authorities are accorded considerable latitude in diagnosis and treatment of prisoners. U.S.C.A. Const.Amend. 8.

**[3] Civil Rights 78 ☞1091**

78 Civil Rights
78I Rights Protected and Discrimination Prohibited in General
78k1089 Prisons
78k1091 k. Medical Care and Treatment. Most Cited Cases
(Formerly 78k135)
In order to succeed in civil rights action based on alleged inadequate medical treatment, prisoner must

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

991 F.2d 64
(Cite as: 991 F.2d 64)

show more than negligence, prisoner must show deliberate indifference to serious medical need. 42 U.S.C.A. § 1983.

**[4] Federal Civil Procedure 170A ⊂═⇒2491.5**

170A Federal Civil Procedure
   170AXVII Judgment
      170AXVII(C) Summary Judgment
         170AXVII(C)2 Particular Cases
            170Ak2491.5 k. Civil Rights Cases in General. Most Cited Cases
Genuine issue of material fact precluding summary judgment existed in prisoner's civil rights action based on alleged inadequate medical treatment as to whether physician-in-charge at state correctional facility knew that prisoner, who had suffered stroke, should receive physical therapy and deliberately failed to provide it for nonmedical reasons, where, at time physician first saw prisoner, prisoner had already spent over seven months in prison system without receiving physical therapy prescribed by his preincarceration physician despite prisoner's notification to authorities of his deteriorating condition and need for immediate therapy, time was of essence since physical therapy must take place within approximately 18 months of stroke to be effective, physician sent prisoner to neurologist for expert evaluation rather than beginning physical therapy, physician then sent prisoner to other doctors for over four and one-half months before following neurologist's recommendation of physical therapy, and physical therapy would have placed considerable burden and expense on prison. 42 U.S.C.A. § 1983.

**[5] Civil Rights 78 ⊂═⇒1336**

78 Civil Rights
   78III Federal Remedies in General
      78k1334 Persons Liable in General
         78k1336 k. Vicarious or Respondeat Superior Liability in General. Most Cited Cases
   (Formerly 78k205(1))
Respondeat superior is not acceptable basis for liability under § 1983. 42 U.S.C.A. § 1983.

**[6] Civil Rights 78 ⊂═⇒1091**

78 Civil Rights
   78I Rights Protected and Discrimination Prohibited in General
      78k1089 Prisons
         78k1091 k. Medical Care and Treatment. Most Cited Cases
   (Formerly 78k135)
Warden and Commissioner for Corrections, neither of whom were physicians, could not be considered deliberately indifferent to prisoner's medical needs simply because they failed to respond directly to medical complaints of prisoner, who was already being treated by prison doctor. 42 U.S.C.A. § 1983.

***65** Philip J. Moran, Robert J. Haney (argued), West Trenton, NJ, for appellant.
Robert J. Del Tufo, Atty. Gen., Mary C. Jacobson, Deputy Atty. Gen., Deborah J. Gottlieb (argued), Howard J. McCoach, Deputy Attys. Gen., Trenton, NJ, for appellees.

Before STAPLETON, SCIRICA and NYGAARD, Circuit Judges.

STAPLETON, Circuit Judge:
This appeal arises out of the district court's grant of summary judgment for defendants in a civil rights action brought by plaintiff Joel Durmer, an inmate in the New Jersey correctional system. Mr. Durmer claims that the defendants violated his civil rights through their deliberate indifference to his medical needs during his period of incarceration. The district court concluded that, as a matter of law, no deliberate indifference was present here and thus, summary judgment in favor of the defendants was appropriate. For the reasons outlined below, we disagree with this conclusion with respect to defendant O'Carroll and will reverse and remand for further proceedings.

I.

In March 1987, Durmer suffered a cerebral vascular incident which caused his left leg to drag and weakness in his left arm. In June 1987, he was involved in an automobile accident which caused,

991 F.2d 64
**(Cite as: 991 F.2d 64)**

among other things, an injury to his back. On October 1, 1987, Durmer allegedly suffered another stroke which further weakened his left leg and arm. On October 2, 1987, Durmer began his period of incarceration in the New Jersey prison system, a period which ended with his release on April 10, 1989.

Prior to his incarceration, Durmer was treated by Dr. Campollataro, an orthopedic *66 physician. At Dr. Campollataro's orders, Durmer had received extensive physical therapy until the date of his incarceration. Durmer's first six months in the New Jersey prison system were spent in the Ocean County jail. There, he was permitted to use a TENS unit (transcutaneous electrical stimulator) and a cane, but was unable to continue with the physical therapy prescribed by Dr. Campollataro. [FN1] Allegedly, upon notifying the prison authorities of his need for physical therapy, Durmer was told that such therapy was unavailable at the County jail but would be available once he was transferred to the state system. Durmer claims that his condition deteriorated during his time at the Ocean County jail.

> FN1. The physical therapy prescribed by Dr. Campollataro apparently included the use of an exercycle, active massages, and water therapy.

On April 22, 1988, Durmer was transferred to the Yardsville Correctional Center where he saw Dr. DelCastillo, a psychiatrist, who examined him and concluded that his medical complaints were valid. On or about May 5, 1988, Durmer was transferred to Mid-State Correctional Facility where he remained for the duration of his incarceration. Shortly after that date, Durmer saw Dr. O'Carroll, the physician-in-charge at Mid-State and advised him of his physical problems. In particular, Durmer told Dr. O'Carroll of his strokes, his increasing left-side weakness, and his immediate need for physical therapy pursuant to Dr. Campollataro's orders.[FN2]

> FN2. The warden of Mid-State at this time

was Robert Barker, and the State Commissioner for Corrections was William Fauver. Both Barker and Fauver are named defendants in this suit.

Dr. O'Carroll did not reinstitute any physical therapy but instead chose to wait for Durmer's medical records to arrive and send him for further examination. On June 29, 1988, Durmer was sent to the Trenton State Prison-Neurology Clinic where he was examined by a neurologist, Dr. Chaudry. Dr. Chaudry's report indicated that Durmer had, in the past, suffered a stroke and it concluded with two recommendations. First, it recommended physical therapy and second, it recommended that Durmer also see a neurosurgeon to examine Durmer's back problems and explore the possibility of disc disease. Durmer did not receive physical therapy, however. Instead, Dr. O'Carroll sent Durmer to see a neurosurgeon, Dr. Scheuerman, on July 6, 1988.[FN3] Dr. Scheuerman recommended a bed board and medication with Motrin. Allegedly, he also told Durmer that physical therapy would not be effective more than 15-18 months after a stroke, and that water therapy (one of the forms of therapy originally recommended by Dr. Campollataro) was not available in prison.

> FN3. At his deposition, Dr. O'Carroll claimed that the reason for this was to rule out disk disease before beginning physical therapy and thereby prevent further injury.

Over the next three months, Durmer continued to complain about the lack of physical therapy to Dr. O'Carroll and allegedly wrote letters expressing the same complaints to Mr. Barker (the warden of Mid-State) and Mr. Fauver (the State Commissioner for Corrections). He claims that his condition grew progressively worse over that period as he lost movement in his left leg and foot. In October 1988, Dr. O'Carroll sent Durmer to see Dr. Scheuerman again, apparently to evaluate whether physical therapy would be effective. Dr. Scheuerman recommended that Durmer see a physiatrist [FN4] regarding physical therapy and that he use his TENS unit full time.[FN5] Pursuant to the first part of this recommendation, Dr. O'Carroll sent

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

991 F.2d 64                                                                                         Page 4

991 F.2d 64
(Cite as: 991 F.2d 64)

Durmer to be evaluated by Dr. Carabelli, a physiatrist, on November 9, 1988. Dr. Carabelli recommended an orthotic device for Durmer's left foot and a limited three-week physical therapy program to instruct and train Durmer in the use of that device. However, Dr. Carabelli recommended against any other physical therapy because, at that point, too much time had *67 elapsed for the therapy to be effective.[FN6] Durmer did receive the orthotic device, but never was given the three-week program suggested by Dr. Carabelli, nor, for that matter, any other physical therapy.

> FN4. A physiatrist is a physician specializing in physical therapy.

> FN5. Durmer refused to use the TENS unit as recommended by Dr. Scheuerman.

> FN6. At that point, 20 months had elapsed from the first stroke, and 13 months had elapsed since the second alleged stroke.

Durmer contends that the defendants' failure to provide the appropriate physical therapy during his stay in the New Jersey prison system caused him to lose substantial use of his left leg and foot. This contention forms the basis of Durmer's § 1983 action against O'Carroll, Barker, and Fauver.

## II.

The district court properly exercised jurisdiction over Durmer's suit pursuant to 28 U.S.C. § 1343. We have jurisdiction over the district court's grant of summary judgment for the defendant pursuant to 28 U.S.C. § 1291.

[1] Summary judgment is only appropriate where " there is no genuine issue of material fact and ... the moving party is entitled to a judgment as a matter of law." Fed.R.Civ.P. 56(c). An issue of material fact exists only if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248, 106 S.Ct. 2505, 2510, 91 L.Ed.2d 202 (1986). In considering a motion for

summary judgment, "inferences to be drawn from the underlying facts ... must be viewed in the light most favorable to the party opposing the motion." *Matsushita Electric Industrial Co. v. Zenith Radio Corp.,* 475 U.S. 574, 587, 106 S.Ct. 1348, 1356, 89 L.Ed.2d 538 (1986) (quoting *United States v. Diebold, Inc.* 369 U.S. 654, 655, 82 S.Ct. 993, 993, 8 L.Ed.2d 176 (1962)). Our review of a grant of summary judgment is plenary. *Jefferson Bank v. Progressive Casualty Insurance Co.,* 965 F.2d 1274, 1276 (3d Cir.1992).

## III.

[2][3] Although prison systems have a duty to provide prisoners with adequate medical care, *see, e.g., Estelle v. Gamble,* 429 U.S. 97, 104, 97 S.Ct. 285, 291, 50 L.Ed.2d 251 (1976) ("[I]t is but just that the public be required to care for the prisoner who cannot by reason of deprivation of liberty care for himself."), the law is clear that simple medical malpractice is insufficient to present a constitutional violation. *See id.* at 106, 97 S.Ct. at 292. Indeed, prison authorities are accorded considerable latitude in the diagnosis and treatment of prisoners. *See Inmates of Allegheny County Jail v. Pierce,* 612 F.2d 754, 762 (3d Cir.1979); *see also White v. Napoleon,* 897 F.2d 103, 110 (3d Cir.1990) (" Certainly, no claim is presented when a *doctor* disagrees with the professional judgment of another doctor. There may, for example, be several ways to treat an illness."). In order to succeed in an action claiming inadequate medical treatment, a prisoner must show more than negligence; he must show "deliberate indifference" to a serious medical need. *See Estelle,* 429 U.S. at 104-06, 97 S.Ct. at 291-92;[FN7] *see also Monmouth County Correctional Institution Inmates v. Lanzaro,* 834 F.2d 326, 346 (3d Cir.1987), *cert. denied,*486 U.S. 1006, 108 S.Ct. 1731, 100 L.Ed.2d 195 (1988).

> FN7. The district court concluded that Durmer's medical needs clearly were serious, and the defendants do not appear to contest this conclusion on appeal.

The district court concluded that Dr. O'Carroll's

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

991 F.2d 64                                                                                          Page 5

991 F.2d 64
(Cite as: 991 F.2d 64)

conduct in sending Durmer to several different specialists and providing of some treatment precludes a finding of deliberate indifference. According to the court, this case is simply an instance of a treating physician opting for a different course of treatment than that suggested by another physician. While this may be one reasonable reading of the record in this case, we cannot conclude that it is the only one.

[4] At the time Dr. O'Carroll first saw Durmer, Durmer had already spent over seven months in the New Jersey prison system without receiving the physical therapy*68 prescribed by his pre-incarceration physician, despite Durmer's repeated notification to the authorities of his deteriorating condition and his need for immediate therapy. Because it is undisputed that physical therapy must take place within approximately eighteen months of a stroke to be effective, time was of the essence. Rather than beginning physical therapy after examining Durmer and receiving his medical records, Dr. O'Carroll opted to send Durmer to a neurologist for an expert evaluation. The neurologist, Dr. Chaudry, specifically recommended physical therapy. Yet, Dr. O'Carroll chose to ignore this recommendation for over four and a half months. During this time, he instead sent Durmer to other doctors, none of whom ever explicitly suggested that physical therapy would be inappropriate. While a reasonable trier of fact might believe Dr. O'Carroll's explanation that these evaluations by other doctors were, in his judgment, medically desirable before beginning physical therapy,FN8 it might also reject this explanation as merely a pretext for avoiding physical therapy.FN9 There is some evidence in the record suggesting that Dr. O'Carroll might have had a motive for deliberately avoiding physical therapy, namely, that physical therapy would have placed a considerable burden and expense on the prison and was therefore frowned upon throughout the prison health system. FN10

FN8. The reason Dr. O'Carroll sent Durmer to a neurosurgeon, on Dr. Chaudry's recommendation, was to rule out the possibility of disk disease. Dr.

O'Carroll claims that he wanted to rule out disk disease before beginning physical therapy because disk disease might be the cause of all Durmer's problems and/or might be aggravated by physical therapy. There appears some reason to question this explanation, however. Dr. Chaudry's recommendation made no mention of the neurosurgical evaluation having to take place *before* physical therapy. Durmer had, in fact, had several months of physical therapy before entering prison. Perhaps more importantly, the neurosurgeon ultimately does not appear to have diagnosed Durmer as having disk disease; although the neurosurgeon's report did not recommend physical therapy, it also in no way suggested that physical therapy would be inappropriate or harmful.

FN9. According to Defendants' own brief, " Dr. O'Carroll sent [Durmer] to consultant after consultant in order to establish what his specific problems and needs were, and ultimately sent him to a physiatrist for physical therapy...." While this might, as defendants suggest, indicate that Dr. O'Carroll was "conscientiously ... [trying] to determine whether [Durmer] really needed physical therapy or whether physical therapy might actually inflict more damage," it might also reasonably be viewed as an intentional delaying tactic designed to avoid having to provide physical therapy until it was too late. Diagnosis is not equivalent to treatment; a defendant might be deliberately indifferent to a prisoner's specific medical needs regardless of how many doctors he sends him to for diagnosis.

FN10. In his deposition, Dr. O'Carroll testified that in order for Durmer to get physical therapy "the patient would have to go out [of the Mid-State Facility]. Arrangements would have to be made for his transportation. It would have to be cleared by Trenton most likely." Durmer, in his affidavit, also claims that Dr.

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

991 F.2d 64                                                    Page 6

991 F.2d 64
(Cite as: 991 F.2d 64)

Scheuerman, the neurosurgeon, told him that water therapy was not available in prison, and that he personally did not believe in physical therapy for prisoners. Durmer additionally alleges that a nurse told him that "this is jail. This is not the real world, you can forget physical therapy."

In *Lanzaro*, we noted that deliberate indifference could exist in a variety of different circumstances, including where " 'knowledge of the need for medical care [is accompanied by the] ... intentional refusal to provide that care' " or where "[s]hort of absolute denial ...'necessary medical treatment [i]s ... delayed for non-medical reasons,' " or where " ' prison authorities prevent an inmate from receiving recommended treatment.' " *Lanzaro*, 834 F.2d at 346 (citations omitted).[FN11] Under the circumstances present in this case, we cannot conclude as a matter of law that Dr. O'Carroll's conduct did not run afoul of the *Lanzaro* standard. Indeed, we note that defendants rely so much on a suggestion that the treatment provided Durmer *69 was adequate and appropriate,[FN12] but rather that if it was inappropriate, it was no more than mere negligence. However, if we assume that Durmer received inadequate medical care, Dr. O'Carroll's intent becomes critical: if the inadequate care was a result of an error in medical judgment on Dr. O'Carroll's part, Durmer's claim must fail; but, if the failure to provide adequate care in the form of physical therapy was deliberate, and motivated by non-medical factors, then Durmer has a viable claim. It is therefore important that the trier of fact hear Dr. O'Carroll's testimony in order to assess his credibility, and that Durmer's counsel be permitted to explore the doctor's motivation on cross-examination.[FN13]

FN11. Durmer also relies on two other examples of deliberate indifference cited by *Lanzaro*: "[w]here prison authorities deny reasonable requests for medical treatment ... and such denial exposes the inmate 'to undue suffering or the threat of tangible residual injury' " and "where prison officials erect arbitrary and burdensome procedures that 'result[ ] in interminable delays and outright denials of medical care to suffering inmates.' " *Lanzaro*, 834 F.2d at 346-47 (citations omitted).

FN12. None of the specialists to whom Durmer was referred have ever stated that physical therapy would have been inappropriate, and the reports of both Dr. Chaudry and Dr. Carabelli suggest that physical therapy would have been effective if administered promptly after Dr. Chaudry's recommendation.

FN13. We do not mean to suggest that a plaintiff is entitled to a trial anytime he can present a genuine issue of fact as to whether the care provided was adequate. Clearly, there must also be a genuine issue of fact regarding the defendant's intent. We hold only that, in light of the surrounding circumstances, there is a triable issue of fact as to whether Dr. O'Carroll knew that Durmer should receive physical therapy and deliberately failed to provide it for non-medical reasons.

[5][6] While we believe summary judgment was improperly granted with respect to Dr. O'Carroll, we believe that summary judgment was proper with respect to defendants Barker and Fauver. The only allegation against either of these two defendants was that they failed to respond to letters Durmer sent to them explaining his predicament.[FN14] Neither of these defendants, however, is a physician, and neither can be considered deliberately indifferent simply because they failed to respond directly to the medical complaints of a prisoner who was already being treated by the prison doctor.

FN14. Respondeat superior is, of course, not an acceptable basis for liability under § 1983. *See, e.g., Polk County v. Dodson*, 454 U.S. 312, 325, 102 S.Ct. 445, 453, 70 L.Ed.2d 509 (1981).

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

991 F.2d 64

991 F.2d 64
**(Cite as: 991 F.2d 64)**

### IV.

Accordingly, the district court's order granting defendants' motion for summary judgment will be affirmed with respect to defendants Fauver and Barker. Because we believe that a reasonable trier of fact could conclude that Dr. O'Carroll was deliberately indifferent to Durmer's medical need for physical therapy and that this indifference caused Durmer's physical injury, we will reverse that portion of the district court order which granted summary judgment for Dr. O'Carroll and will remand for further proceedings.

SCIRICA, Circuit Judge, dissenting.
Because I find no evidence of deliberate indifference to a serious medical need on the part of Dr. O'Carroll, I would affirm the judgment of the district court.

Before his incarceration, Durmer was examined and treated by his own doctor, Dr. Campollataro. From October 2, Durmer was incarcerated in an interim facility where he received no physical therapy. Five months later, he was transferred to yet another facility where he received no physical therapy. Finally, on or about May 5, 1988, six months after his last stroke, Durmer was transferred to the Mid-State Correctional Facility. Dr. O'Carroll's first examination occurred shortly thereafter.

As the majority notes, Durmer told O'Carroll of his strokes, his left-side weakness, and his need for physical therapy. Because Dr. O'Carroll had no records of Durmer's medical history, he waited for Durmer's full medical records to arrive before prescribing treatment. After receiving and reviewing the records, Dr. O'Carroll referred Durmer to a neurologist to determine the appropriate treatment.

On June 29, 1988, Durmer was examined by Dr. Chaudry at the Neurological Clinic at Trenton State Prison. Dr. Chaudry recommended physical therapy and an evaluation by a neurosurgeon to rule out disc disease as the cause of Durmer's problem. Dr. O'Carroll testified that he feared that if disc disease were the root of Durmer's *70 problem, physical therapy might cause further injury.

Therefore, he had Durmer evaluated by a neurosurgeon, Dr. Scheuerman, on July 6, 1988-about a week later. Dr. Scheuerman concluded that Durmer had a clot in a blood vessel in his brain and recommended a bed board and continuous medication with Motrin. Dr. Scheuerman's written recommendations did not include physical therapy. It appears that Dr. O'Carroll followed Dr. Scheuerman's recommendations. As the majority notes, Durmer testified that Dr. Scheuerman told him physical therapy would not be effective more than 15 to 18 months after a stroke and that water therapy was not available in prison.

Durmer continued to complain to Dr. O'Carroll about his need for and failure to receive physical therapy. Dr. O'Carroll sent Durmer back to Dr. Scheuerman specifically for a recommendation regarding physical therapy. On October 12, 1988, Dr. Scheuerman recommended that Durmer use the TENS unit and see a physiatrist regarding physical therapy. Ignoring Dr. Scheuerman's recommendation, Durmer refused to use the TENS unit as prescribed and signed a statement accepting "full responsibility" for his decision.

Dr. O'Carroll then sent Durmer to see a physiatrist, Dr. Carabelli on November 9, 1988. Dr. Carabelli prescribed an orthotic device for Durmer's left foot and ankle, with three weeks of physical therapy to train him in the use of that device. Durmer testified that he never received the three-week therapy. Dr. Carabelli did not recommend any additional physical therapy because he believed it was too long after Durmer's stroke to do any good.

I can discern no evidence of deliberate indifference on the part of Dr. O'Carroll. The suggestion that Dr. O'Carroll intentionally delayed physical therapy by referring Durmer to specialists is speculation. When Dr. O'Carroll first examined Durmer in May 1988, it appears from the record that the last recommendation for physical therapy occurred before October 2, 1987, the date Durmer was incarcerated. It seems reasonable that a treating physician examining a patient in May 1988 would not rely on the patient's request for a specific treatment, based on his doctor's recommendation

991 F.2d 64                                                                                                                    Page 8

991 F.2d 64
**(Cite as: 991 F.2d 64)**

some eight months earlier, but would first want to examine the medical records and then refer the patient to a specialist. Dr. O'Carroll sent Durmer to two specialists and largely followed their recommendations. Dr. O'Carroll also offered evidence that he instructed Durmer on exercises to rehabilitate his back and promptly treated several other ailments.[FN1] I see no evidence that Dr. O'Carroll delayed necessary medical treatment for non-medical reasons.

> FN1. In May 1988, shortly after his transfer to Mid-State, Durmer complained of an ulcer. Dr. O'Carroll promptly examined him, ordered a UGI, and prescribed Persantine and Zantac. A month later, Durmer complained of a dark bowel movement and a fungus rash. Dr. O'Carroll examined Durmer, found no sign of a gastro-intestinal problems, and prescribed a treatment cream for the rash. In September 1988, Durmer complained of pain in his right knee. Dr. O'Carroll sent him to an orthopedist, Dr. Wang, who prescribed use of a hinged knee brace and ordered an arthrogram. O'Carroll also examined Durmer's back several times, prescribed exercises to strengthen it, and-according to Durmer's testimony-"tried two or three different type [sic] of medications" to treat his ailment.

At most Durmer has presented evidence of medical malpractice. It is well-established that medical malpractice alone does not violate the Eighth Amendment. *Estelle,* 429 U.S. at 106, 97 S.Ct. at 292; *see White v. Napoleon,* 897 F.2d 103, 110 (3d Cir.1990) (recognizing the "well-established rule that mere disagreements over medical judgment do not state Eighth Amendment claims"). Because I find no evidence of deliberate indifference on the part of Dr. O'Carroll to any of Durmer's medical needs, I respectfully dissent.

C.A.3 (N.J.),1993.
Durmer v. O'Carroll
991 F.2d 64

END OF DOCUMENT

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.